Our first case of the morning is Columbia Gas Transmission v. 1.01 Acres, more or less, at Owl. Good morning. May it please the Court? My name is John Wilburn. With the Court's permission, I'd like to reserve five minutes of time for rebuttal. All right. That's a lot of rebuttal, but you may have it. Thank you. A brief factual background. Columbia Gas is a provider of interstate transmission of gas. They operate a natural gas... I don't think you need to give us any factual background. We've got a lot of questions for you. We're well aware. Okay. Well, I'll jump into the authority. As the Court's aware, we moved to condemn the property interest at issue in this case to construct a project. The project is one that we believe is authorized under a combination of the Natural Gas Act, our blanket certificate... Take us through how you think that flows, if you will, not to make a pun. That's fine, Your Honor. The Natural Gas Act 717H provides the power of eminent domain where a certificate holder has the right of eminent domain. This is subsection H. Where any holder of a certificate of public convenience and necessity cannot acquire by contract or able to agree with the owner the rights necessary to... And, of course, that's the case here, we know. That's the case. And there was no dispute at the trial court below that we have the certificate of public convenience and necessity... Okay. ...and that we weren't able to reach an agreement with the landowners. So those issues were undisputed. The question, I think, that the district court dealt with and the issue before this court is whether the project is something that fits within the scope of the federal regulations. There are, we've explained, three tiers of authority to condemn property under the federal regulations. Why don't we start with the certificate itself? You mentioned it, but the language of the certificate itself provides that you're authorized to conduct, quote, many routine activities and abandoned facilities in service of a self-implementing basis without further authorization of the commission, period, for other categories of activities which may potentially require more scrutiny and opportunity for public participation and public participation disauthorization subject to notice and procedure, et cetera. So is eminent domain you're exercising the power of the government to take other people's land? Is that the sort of thing that fits within something that should be considered potentially requiring more scrutiny and opportunity for public participation? Well, this has been dealt with both by Congress and FERC, and the right of eminent domain for a certificate holder is embodied in 717H, and the specific activity that we're talking about here is authorized by 18 CFR 157203 subpart B. That's because it's a routine activity? It's more than that. It actually doesn't define it simply as routine activity. What the regulation says is a blanket certificate issued. Right, this is the automatic authorization. That's right. It provides automatic authorization for a list of specific activities, and those are identified in subpart 208. The district court thought that interpretation that you gave that was going to be swallowing the rule of 2.55, right? Didn't the district court have the impression that if 208 is read the way you suggest, then 2.55 is meaningless, because as soon as you walk in and say, hey, it's just routine, who cares where we go? You're good to go. Right. Yeah, that's a misunderstanding of the interplay between the two of those. 2.55 applies very specifically to replacements that are in the existing right-of-way, and there are other benefits of 2.55 authority. The first is that … And they are not eligible facilities, correct? Well, it doesn't have to be an eligible facility, which is a subpart. It can be any facility that we have in a 2.55 situation. But there are other benefits. For example, under 1.57, which is more narrow than 2.55, 1.57 has to be first an eligible facility. The project has to be under the statutory cap, or it's a 2.55. It doesn't have to be, right? FERC's waived your $11 million here, right? They have the ability to waive it, but absent a waiver, it has to be under the cap, and the additional obligation is permitting. Under 2.55, you're rebuilding in the existing right-of-way with the same facility, so you don't have to follow the environmental permitting. 1.57 is much more narrow. 1.57, it has to be an eligible facility as defined by FERC. An eligible facility being what? An eligible facility, there's a list of those. It includes, which is relevant to this case, is a mainline. It would be a mainline that does not meet … Mainline replacement that do not qualify, right? That do not qualify. Replacement is a pretty important word. Replacement, we'll talk about that, is a critical word. But a mainline replacement that doesn't meet, this is equally critical, the location and temporary workspace requirements of 2.55. Well, then, if it didn't have any location associated with it, why did FERC for some time take the position that it was anticipated that replacements would be within or adjacent to the right-of-way? I don't believe that's a correct reading of that 2003 comment, and I'll tell the court why. That's their language. I mean, it's virtually a quote. Presumably adjacent. Presumably adjacent, but that's Note 11. If you read it in context, there's, I think, three things that are important to note. The first is Note 10, which immediately precedes it and is very specific, says that the power under 157 allows for the acquisition of new right-of-way, which would not be a 2.55 situation, to construct a new facility and to exercise the power of eminent domain for that purpose. That's immediately preceding Note 11. Doesn't that just, if we read that the way you're suggesting, then what is the meaning of the words presumably adjacent? Is that just like throwaway language? It's not, and we know what it means. I think what it meant originally was exactly what we argued, and that is that when you have to construct outside of, in this case, what was suggested there, a disaster or a terrorist attack, that presumably you would do it adjacent. It's an operational assumption. Well, it's also an economic assumption. It's also an economic assumption. It's almost like gravity. You're going to go as close as you can. Well, that's right. What's sort of lost in all of this is there's no reason that the company, in this case, would want to go a quarter mile off of the existing right-of-way. FERC recognized that presumably you would construct it adjacent to, in that case, the disaster site. So the limiting principle is trust us? We don't have an interest in going someplace else? No, it's not, and that language is not limiting. That language doesn't say we interpret the language, we interpret this regulation to limit you to the existing right-of-way or adjacent, and FERC explained that. What is the relevance of that notice of rulemaking and that footnote? What is the relevance? Well, the relevance of that notice of rulemaking was it was in response to 9-11, and they were looking for an opportunity to deal with terrorists in the language, terrorist situation. And actually remove restrictions. And remove restrictions. To give broader rights under 157. And what they did under 157 is they added the emergency concept. That's not a play here. Well, if they were seeking to broaden it, and they included the language presumably adjacent, doesn't that imply that, in fact, without that broadened authority, the presumably adjacent language would be even stronger? It would be necessarily adjacent or something like that? Well, I think that's one way to read it, but I don't think that's the correct reading. I think the correct reading is the way that FERC has explained that note. They've done it recently in that note 78. What is the effect of note 78? Well, note 78 has it. It came kind of late in the game in the district court. How should we handle that? We can't help that. I'll sort of point out on that issue. No, no, I'm not believing you. When you look at the cases that have been cited by none of the district court but by us referencing our defenses, that nearly all of those cases were involved interpretations by an agency that came in amicus briefs, that actually came in a case late in the process, and the court gave deference in each circumstance to the agency's interpretation. Well, the agency itself in this note 78 says our previous interpretation was adjacent to if not within. Your Honor, I disagree with that. I think what they've explained, and the language on this I think is helpful. Why don't we just read it? We'll just read it. Read it out loud. While the commission has previously indicated that it is contemplated that replacement facilities constructed under blanket authority would usually be located adjacent to if not within an existing right-of-way. What does that mean? If it doesn't mean we've told you before under 157 you're within or adjacent to. What does it mean if it doesn't mean that? I think what's important is the language here doesn't say we previously interpreted this to require it to be within or adjacent. What they say is using the language. Do you think the lack of the word interpret makes a difference? No, I think what they say is we indicated previously that it is contemplated that replacement facilities constructed under blanket certificate would usually. It doesn't say required or must be or have to be. Again, you get back to the economy and why would you not? Right. The concept is that if you have an explosion, a 9-11 event, and that's what they were dealing with with that comment, they wanted to allow an opportunity for the gas company to construct. Well, I'm puzzled. Why would the, if there's no difference, because your position is there's no difference here. Note 78 reflects no change in position whatsoever. If there's no change in position, why did FERC go out of its way to say while in the past we said X, now we say Y? I don't know why. What's the point? I don't know why FERC wrote the note, but it's not a change. Was it because they recognized there was a change perhaps? Well, I don't read that to be a change. Or it's an ambiguity that they wanted to clear up. Maybe it's an ambiguity. Because they read the district court opinion in this case. They may have read the district court opinion in this case. I wasn't party to any of that, but the district court opinion came out. I don't know what the timing is on this note. But I'd also point out there's two things. It's like a week later, right? It came out a week later. What a coincidence. Well, I'm not sure that that, I don't think there's any case law that would suggest that that divests the obligation of the court to afford that. How about Christopher v. Smithkline-Beacham, which says when you've got agency interpretation which differs from past agency interpretation and does not reflect careful and thoughtful interpretive work, you don't get deference. Is that a case law that ought to inform our decision? That case says may, and it should inform the decision. That's the one case that was cited by the court or by any of the parties where deference was not afforded. Well, you get the EEOC case from a year later, right? The significant difference in that case, though, is that the court found that there was a change in position that would result in, quote, massive liability for one of the parties because of a surprise caused by a change in circumstance. Still, the language of Christopher and the language of EEOC v. Abercrombie and Finch, which came a year later, are pretty clear that our deference is not a blank check and that agencies don't get to turn on a dime and have deference given to their work, right? Yes, I don't disagree with that, but I think we're sort of out of time. But to answer your question on this issue, we have language that I think is clear in the CFRs. 255 has a proximity limitation. 157 does not. The court's read one in. We have three pieces of interpretive information from FERC. We've got the 2003 note, the 2005 note, which says specifically in distinguishing 157 from 255 that you can move the facility under 157. And then we have the 2013 final note. So we have three pieces of interpretive information. The court has relied on the 2003, which is not specific and clear on this point. 2005 is. I'd love to ask you more questions about that, but you've kept five minutes. He's got a lot of rebuttal, so. I apologize, but I have a lot more to say, but I'll sit down now. Fine. Thank you. Thank you. Mr. Arkin. Good morning, Your Honors. This is a case about whether a gas company can take a blanket certificate, dig up a pipeline, and put it anywhere else in the country under the guise of calling it a replacement, not a relocation. Isn't this a case which requires a finding that either this is or is not a replacement? I believe it does, Your Honor. Is that the key question? I think that is a key question, and I think part of that. How is this not a replacement of pipe? The old pipe is old. They need to put in new pipe for safety reasons. Isn't that a replacement? It could be, were it not for the rest of the regulations. The fact is the word replacement has to be read in the ambiance of the rest of it. All right. Looking at the definition of eligible facility. Yes. Within that definition it says further eligible facility includes mainline replacements that do not qualify under 255 because they result in incidental increase in the capacity or because they don't satisfy the location requirement. So doesn't that mean that if something is a replacement of a mainline, it is an eligible facility, and following through the regulations, there is no location restriction, is there? That would perhaps be a reasonable interpretation were it not the other things that are listed there. You have the miscellaneous rearrangement provision that specifically talks about relocations, and it says relocations need to be on the same property. They have some certain restrictions. If the word replacement allows you to completely skip the relocation provision and it exempts yourself from those restrictions, then the word replacement would negate the entire reason. Tell me where a replacement is prohibited from being anywhere other than the existing right-of-way. How do you reach that result? Your Honor, our position is that the regulation is ambiguous to this point. And if it were not for the other provisions. What creates the ambiguity? What creates the ambiguity is the common understanding of the word replacement, that it would be on the same property, and the fact that there's a restriction. Well, I know. I have plumbing in my house, and it's failing, and I need to replace it. Now, it happens that because I have constructed some other things, they can't put the new pipe in exactly the same place. It's a new technological whatever. So they need to put it somewhere else, but it still is my plumbing. I've replaced the plumbing, haven't I? Your Honor, you have, but you've also relocated it. If I take my law office and I... But it's a replacement. The district court here used a quote-unquote dictionary definition to say in the same location, but isn't the common sense meaning of replacement mean something's old needs to be replaced and something new is put in, and that is a replacement? Your Honor, I think the common sense definition of replacement assumes it's on or about the same location. But it can't be because under the definition of eligible facility, the mainline replacement, because it doesn't satisfy the location requirements, that says right away it doesn't have to be in the same right of way. Well, that's exactly where the agency's interpretation of those 1999 amendments that you're talking about that gave that exemption on replacements, the agency in 2003 gave its first interpretation of those 1999 amendments, and it said we were not meaning to give carte blanche authority to basically take something, destroy it, and rebuild it wherever you want. Because whether it's in Lincoln, Nebraska, as Columbia Gas said they could do below before the district court, or whether it's a quarter mile away, the agency did not... Is it a quarter mile or a mile? Your Honor, there's a little bit of a dispute to this. It's our belief that it goes up to a mile, and that's based upon our client's representations as the property owners. But under the Supreme Court case law, you have to look at the context. The Supreme Court has said two miles can be adjacent. What's your contention as to what is or isn't adjacent here? Your Honor, I think the district court, or I think FERC, made a reasonable interpretation of this in 2003. When they were talking in the wake of 9-11, they were looking at, could we rearrange a pipeline to get around the World Trade Center? Could we deal with this emergency situation? And they said, no, we cannot under the current definition, under the current provision for replacements. That never became a final regulation, right? Well, the exemption did. The emergency exemption did. You now have the rearrangement provision that allows you, in cases of emergencies, to rearrange without having to deal with the property restrictions whatsoever. That exception makes no sense under the interpretation proposed by Columbia Gas and under the interpretation now given by FERC. Was the interpretation given in connection with the piece that was finalized? Yes, it was given in connection with the need for creating an exception in the case of emergencies. There's no need for the emergency exception whatsoever if you can just tear it down and replace it anywhere you want. But we're not talking about emergency here. And we're not talking about a notice of rulemaking. We're talking about existing regulations. But we are talking about looking at the regulation and looking at all of the regulations and seeing if they can make sense together. All right. I still have a problem with exactly where you find the ambiguity in the actual regulations. I think the ambiguity is how the regulations play with one another. You have the word replacement. You also have the word relocation. And the word relocation attaches restrictions to it. An extension is the other one, of course. Yes, an extension. This is not an extension. No. Your Honor, I think it's a construction. But I think it's a construction that goes outside the certificate. And I think it's a construction that fits more aptly in the word relocation that has property restrictions. Those same property restrictions make no sense under an interpretation that allows you to relocate through the replacement provision. Well, can I ask you then, what does footnote 78 in the final rule mean? And how should we weigh that? Your Honor, I think the footnote 78 is in direct contradiction of the position I'm advocating today. I think it is exactly what the Columbia Gas is advocating for. I think this court should give it little deference. And I think the district court aptly did that and did not abuse its discretion and did not violate any clear area of law under the reconsideration standard in doing so. I think the footnote 78, as it recognizes in itself, is inconsistent with the agency's prior representation. Are you saying that any time, I mean, this has to happen all the time, that 50-year-old pipe has failed, need to put new pipe down, and there's a shopping center, there's a housing development, there's all kinds of things that prohibit you from doing it in the straight line that it was. And every time that occurs, you're saying, ah, we need to, it's a replacement, but we need to move it a little bit, so we need to go back to FERC. Is that what you're saying? And if you go back to FERC, where does this go? Your Honor, I think the agency's 2003 interpretation makes perfect sense and deals with the scenario you're talking about. It deals with an emergency. Well, the agency's interpretation of the adjacency provision. But they didn't interpret it. They said it's contemplated that it would presumably be adjacent. Well, that's just saying 2 plus 2 is 4. Of course it's contemplated to be adjacent. Why would Columbia Gas want to go six miles out and use three times as much pipe as it had to use? Well, the 2003 FERC interpretation was interpreting the 1999 provision that we're talking about that gave that exception to 2.55. I don't think it interpreted it. It said what usually happens. It says what usually be. I think it did interpret it, Your Honor, and I think it did repeatedly. We're not talking about footnote 11. We're talking about a consistent interpretation throughout that notice of proposed rulemaking. Well, let me go back to this practical matter. Do you need to go back to FERC and say, Mother, may I, every time something goes a little bit out of the way? It depends on a little bit, Your Honor. Well, who's to say? Isn't that the reason why the authority to relocate is given? When it's a relocation of a main line that you can do that?  I mean a replacement. Excuse me. Replacement. Your Honor, we're falling into the same trap that we're dealing with with Columbia. Columbia Gas called this a relocation below, and they said, yeah, but we don't have to deal with the relocation provision. Then Columbia Gas just stopped using the word relocation. Now they're saying, no, it's not a relocation. It doesn't fit that definition. It's a replacement. It is a relocation under the common definition of it. Is it mutually exclusive? Your Honor, I think that they have to be read together. I think if you cannot use the replacement provision to get rid of the relocation restrictions. Otherwise, the relocation restrictions make no sense. Why have a same property restriction on relocation if you can always get around it? It's under the miscellaneous rearrangement. 2.08. 2.08, miscellaneous rearrangements. The certificate holder is authorized to make miscellaneous rearrangements, construct, replace, or operate any eligible facility. And then down below that is the rearrangement restrictions. I'll get the exact subsection. Definitions are in .202. It is down. It's under G. Miscellaneous rearrangements. 6, I, double I, and triple I. So it's .202 in the regs. And then you go A. Are you at 6? B, yeah. B, 6, and then the I through triple. That does not result in any change of service rendered, including changes in existing or relocation of existing facilities. Any facility does not result in any change of service or relocation of existing facilities. I don't know that that's exactly applicable. To respond to, on the same priority. Well, it's saying it includes changes in existing field operations or relocation of existing facilities. One of the things that may be troubling here is the, and I certainly don't presume to speak for any of my colleagues, but the implication in some of the questioning and in the briefing is it's a significant burden if people have to go back to FERC for a new certificate. Do you have any response to that? I mean, what's the? I think the burden is much less than litigating this through the courts. I mean, they're going through eminent domain actions and all of these when this has been going on for about a year now, and they just don't apply for a certificate. But then what happens? Ultimately there is a right of eminent domain. Do you think FERC is going to say, oh, you know, you can't do this? You have to go through this housing development or you have to go through this shopping center? Perhaps. That's why you have federal oversight, and that's why you have the public's ability to comment. Just like putting a new pipeline through our client's property, Columbia Gas has to go through the same procedure. I understand they got a certificate 40 years ago, but that certificate does not allow relocation. It allows routine operations, routine maintenance. But routine activities include replacements of main lines, correct? Replacements of main lines, abandoning them. But this is a replacement that qualifies as a relocation, and they called it a relocation up until their opening brief before this court. The reality is it falls under the common definition of relocation, and the relocation restrictions, the same. What are those restrictions? What would be different in this case if they said, okay, this is a relocation. We come under the definition in 202 sub 6. How would life be different? What are the restrictions they'd have to abide by? It would have to be either on the same property or caused by one of these other conditions, and they would have to demonstrate that it falls under one of the conditions for a relocation. They haven't done that, and they've conceded since oral argument before the district court that they don't qualify under those conditions. And so, quite frankly, there are reasons that the federal regulatory, that FERC, created these restrictions on relocations. Columbia Gases and currently the FERC's position negates all of these restrictions completely. It renders them a dead letter, and the purpose behind these restrictions has to be considered. We are dealing with something that could ostensibly be considered a relocation or a replacement or both, and this is where the ambiguity comes in. There's restrictions on rearrangements. Those restrictions don't apply to replacements. Can we read replacement in a way that renders the relocation restrictions a dead letter? I think that interpretation is a poor one, and one thing that we have to consider is that in eminent domain situations, especially when you have eminent domain by a private company, you're supposed to strictly construe the eminent domain provisions in favor of the property owner. If we accepted all that and we said, oh, the district court was right, there is an adjacency requirement, who's to say that a quarter mile is an adjacent? I mean, who's got the opportunity to do that? Is that something they've got to go back to FERC on, or is Columbia Gas, in the exercise of its own certificate, allowed to say a quarter mile is adjacent? I think that's something that the courts can do. I don't think that that's beyond the ability of the courts. Is your position really that every time there's a question of adjacency, it's got to go to litigation? And then we come up with a bright line rule of whatever it is eventually? Is that really our function? Well, it has to be someone's function, Your Honor. So whose is it? That's the question I'm trying to ask you. I believe in these eminent domain litigation situations, it would be the response, unless FERC gives an interpretation that's clear on what's adjacent and what's not, I think it would be for the courts to decide. If the agency is declining to interpret what they mean by when something breaches the line and goes from replacement to relocation, then the only body left to do that, if Congress doesn't do it, if the agency doesn't do it, is the courts. I see my time has expired. Thank you, Your Honors. Thank you. A bottle? Can I ask you a question? Apparently, this pipeline is just about 95% done. Correct. What's the procedure? I mean, are we just delaying the inevitable here? The procedure is the gas isn't flowing. Let's assume that we affirm the district court. What do you do? You go back to FERC? We would have to go to FERC and start the 7C process, which is a full public hearing on that other 5%. How long does it take? It depends on the number of objections. A year, plus any appellate issues. How long have you been tied up in litigation? Well, we've been tied up in litigation since May of last year, but this is an important principle of law. It absolutely is. The reading that the appellees take, and what's really important about this, is there would be no right under 157. If you accept the district court's opinion and adopt the Webster's Dictionary definition of replace… Which is that it cannot be in any place other than, it cannot be relocated. That's right. Then you're left with 255, because that allows you only in the relocation. The miscellaneous rearrangement, when you look at that, it doesn't apply. It deals with the same. 157, you would never be able to exercise that right. Really? You'd never be able to? Or would you be able to by doing just what FERC said back in 2003, which is if you're not going to be in and you're not going to be adjacent and you want to go take somebody else's land, then maybe you should be going back and talking to the agency. Because, like they said in Williston in the Ninth Circuit, that's what the regulatory body is supposed to do, make sure that corporate actors like Columbia Gas, laudatory citizens, though they may be, are not out exercising the power to take fellow citizens' property without government oversight. That's correct. We could do that. That's the Tier 3 7C authority. But the point is, if the court affirms the district court's decision, there's no Tier 2 authority. There's only Tier 1, which is in the existing right-of-way, and Tier 3, which is back to the FERC. I thought when you said in the existing right-of-way, haven't you just ignored what FERC said in 2003 and what the district court said, which is there is an adjacency issue here? Well, we disagree with the district court. Well, you may disagree with it, but you ignore it and say there's no Tier 2. Isn't that the Tier 2, that you've got some flexibility? Well, if the court affirms that and believes there's adjacency, then the Supreme Court has spoken on what adjacency means, and we've cited that case. Is it contextual? Does it matter that you were talking about a case 100 years ago with a railroad next to a national park, as opposed to going through York and residential areas? Does that make a difference in what adjacent means? Well, it's certainly a different fact pattern, but I think it's instructive. The Supreme Court was asked to define adjacency within a federal statute involving a right-of-way 30 years ago. Would you address specifically the miscellaneous rearrangement provision? As far as I can tell, that is where they're saying there is an ambiguity created. And it says miscellaneous rearrangement changes anything or relocation of existing facilities on the same property when required, etc., etc. And that's the problem. It's reading the rest of that. Miscellaneous rearrangement deals with a couple of things. One, it's moving the existing facility. And so if that contemplates us, we would take this 50-year-old pipeline that's unsafe and dangerous, and we would move it somewhere on the existing property. Or maybe, why doesn't it mean you would be altering or moving it in the sense of replacing the pipe itself, but moving the facility in the sense that you no longer have the pipe running through property owner X's land, you've got it moving through property owner Y's land? Well, under this, under miscellaneous rearrangement, we're limited to the same property. It says it's subpart 6, little i, and the first limitation is on the same property. If it weren't a replacement, you'd have a problem. But you're saying once it's a replacement, you're under eligible facility. Right. That's the thing. The definition that sort of pushes us on miscellaneous rearrangement, that's one option. It doesn't apply because it's limited to the same property. 255 doesn't apply because it's the same property. There are circumstances where you need to replace it, like here, and you can't be on the same property because of, in this case, a high-consequence area. You would be going through neighborhoods. And so FERC has recognized that, and, frankly, the language makes that clear. What are we to make of your concession below that this is authority that allows you to go pretty much wherever you want? You could go through Lincoln, Nebraska, if you wanted to. The hypothetical, and what I think I said completely, is subject to the limitation. Well, here the limitation that you were relying on was an $11 million cap, but, of course, FERC can waive that and has waived that. So that being gone, you really could go there. And you're reading this. You could route yourself up through Philly if the urge struck you. Well, I don't think we can because we'd have to replace the line. We'd be replacing the capacity on this line within the scope of this certificate. So could I have chosen the words better and said we were in a dialogue for a couple hours in the district court? So I don't want to track you on that. The capacity is a limitation. The capacity is a limitation. So that if you did go out from York, if you went all the way out to Pittsburgh, the capacity would be so much bigger that it would violate. There are a lot of limitations. We can't increase the capacity. We can't increase the dollar figure. There's permitting. And it has to, most importantly, replace the existing facility. What does that mean? Your limiting principle is what? I'm sorry? No, there's more than that. It's also limited to replacing the existing facility, which is what we're doing here. It's also related. What is that? I don't want to get bogged down in semantics too heavily, but that's where we are. If you're taking out six pipes, you put back six pipes? I mean, that's essentially right. We're moving, in this case, one pipe with a specific capacity, and we can't use that as an opportunity to, for example, build two new pipes or increase the capacity. Sure, you're not going to increase the capacity, but presumably, and these are your words, not mine, you could build the same capacity pipe, that is, a pipe of the same diameter with the same pressure behind it and route it a much further distance if the urge struck you. Is that right? No, I don't think that's right. I appreciate the Court's characterization of what I'm saying. That's not right. What we're asking, what we believe the regulations allow us to do, is to replace this pipeline, and it allows us to go outside the existing right-of-way. Anywhere? Well, within the scope of the limitations, which are monetary, environmental, we have an existing blanket certificate, and to replace that facility. The rules allow for a complaining landowner to go to FERC, and FERC has enforcement authority if we are exceeding the rights under the CFR to enforce it. So the burden is on the landowner to go to FERC and say, they're exercising eminent domain on my property on their 30-year-old certificate outside of the right-of-way they had. The burden isn't on you as a private citizen who wants to take another private citizen's property to go to FERC and get a new certificate. That's the Columbia Gas position, right? No, it's our position that if we can't reach agreement, we condemn, and the Court decides whether we have the authority to do that. We believe we do. And for the last point, I'll say if I can. If I could ask you about that just one second. So is there an administrative, some sort of administrative procedure that needs to be exhausted then? You're saying you can go to FERC in the first instance. No. We can go to FERC in the first instance if we choose Tier 3 authority. I'm talking about the landowner. The landowner always has the ability to go to FERC at any point in time and complain about any of our activities. We're regulated by FERC. And if we're exceeding our certificate, for example, or we're outside our certificated boundaries or operating in a way that we're not allowed, FERC has administrative enforcement authority. I'm not suggesting that they should or need to do any of that, but what I am saying to you is that if we're going to Nebraska or otherwise doing something that's inappropriate, FERC has the ability to stop it. In the context of this litigation, the question is, was the district court correct in adopting a definition that says replace means at the restore to the original location? And if that definition is accepted. Is there a reason you stopped using the word relocate? No. Relocate, I'm comfortable with the word relocate. I mean, I want to stick to the statutory definition. The 2005 guidance uses the concept of the words move the facility. We are moving the facility. We're locating it around this high consequence area. But you are replacing. We're doing it in the context of the authority to replace. And the suggestion that there's a relocation provision that we could otherwise utilize is simply incorrect. It's incorrect because if you were under the relocation provision, you would have to go back to FERC, right? No, we would not. It's automatic. And it's automatic in the language, too. But it's not labeled. It's sort of a misnomer to say relocation provision. It's labeled miscellaneous rearrangement. That's what it is. Council has referred to this as a relocation provision. But that's permissible. Yeah, it's permissible to make a miscellaneous rearrangement. See, that's the thing. I think Council was leading us to believe that's wrong. There's no relocation provision. When you say there's no relocation provision, it defines it as a relocation. It talks about miscellaneous rearrangement. It talks about or relocation. That's the language of it. To relocate on the same property, that's correct. Yeah, because if you want to relocate and you want to relocate someplace outside of the boundaries of where you are, then you're supposed to go to FERC under that provision, right? No. I think the miscellaneous rearrangement is a permissive provision. It's permissive. It's not a limiting provision. It's permissive. It's not limiting. It is in addition to when you look at 157-208, there are three concepts that are built in that. One's emergency, which is what those two or three notes relate to. One is the automatic entitlement under 208-A. That's the list that we're relying on. And the third is the miscellaneous rearrangement. They're independent concepts. Can I ask you one? Can you tell us the precise relief you're seeking? Do you want to remand? Well, we would ask you to reverse the court's decision and enter summary judgment, partial summary judgment. Because you're looking for an injunction, right? We're looking for both. There were two motions before the court. The first was partial summary judgment under the East Tennessee gas case and its progeny. In order to obtain the injunctive relief, we have to establish by partial summary judgment the right to condemn. So we moved for that. We think that is clear, and the court should grant summary judgment. The second piece of relief we're asking for is the immediate possession. The only rationale the district court gave dealing with that issue was that we were not likely to succeed on the merits because of the lack of court belief. But shouldn't the district court make the findings on the rest of the findings on the preliminary injunction? There's safety concerns and all that may not be before us, I guess. Well, I understand if that's the decision. I'd suggest to you that the record is complete on that. We submitted affidavits that were unrebutted at the district court level. I just saw one affidavit of Doug Hawley. We did. It was an affidavit of Doug Hawley, and I think the other affidavit, I apologize, was submitted on a motion for emergency hearing. But the affidavit of Doug Hawley dealt with the PHMSA issues and the safety issues. But if the court – I sort of noodled that through, and I'm not sure we'd ask you to enter the injunction. I absolutely understand why you might be remanded on a factual determination for that. We do think there's no factual questions, only a question of law on the summary judgment. I question money. For just compensation. Absolutely. None of this affects the landowner's right to a hearing on just compensation, and we understand that. That's within the context in which this was brought. That's right. Partial summary judgment on entitlement, set a trial date on just compensation. All right. Thank you. Thank you. Thank you very much. Case is well argued.